UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

OUR WATCH WITH TIM THOMPSON,

Plaintiff,

v.

ROB BONTA,

Defendant.

No.  2:23-cv-00422-DAD-DB

ORDER GRANTING, IN PART, DEFENDANT'S MOTION TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

(Doc. Nos. 12, 13)

This matter came before the court on July 11, 2023 for a hearing on defendant's motion to dismiss and plaintiff's motion for a preliminary injunction against defendant Rob Bonta, in his official capacity as Attorney General of the state of California.  (Doc. Nos. 12, 13.)  Attorney Mariah Rose Gondeiro appeared by video for plaintiff.  California Deputy Attorney General Nimrod Pitsker Elias appeared by video on behalf of defendant.  For the reasons explained below, the court will grant defendant's motion to dismiss, in part, and deny plaintiff's motion for a preliminary injunction.

**BACKGROUND**

In the operative first amended complaint ("FAC"), plaintiff Our Watch with Tim Thompson ("Our Watch") alleges that it is a nonprofit public benefit corporation "committed to protecting family and parental rights, religious liberty, and the right to life across California." (Doc. No. 10 at ¶ 11.)  Plaintiff states that it engages in "legislative advocacy, education of

1

1  California citizens, and mobilization of California citizens to get involved in community events."

2  (*Id.*)  According to plaintiff, its mission consists of "tackling major cultural issues, including the

3  sexual indoctrination of children, critical race theory, and abortion rights," and plaintiff represents

4  that it "firmly believes that transgenderism is a cultural issue that it must deal with in accordance

5  with God's design for every child, as outlined in the Bible."  (*Id.* at ¶ 12.)

6       Plaintiff brings several constitutional challenges to a recently enacted California statute

7  pertaining to the provision of gender-affirming health care and gender-affirming mental health

8  care to minors.  (*See id.* at 18–21.)  The challenged statute is summarized below.

9  **A.      California Senate Bill 107**

10       On September 29, 2022, after passing both houses of the California state legislature,

11  Governor Gavin Newsom signed into law Senate Bill 107 ("SB 107").  (Doc. No. 10 at ¶ 34.)  SB

12  107 added and/or amended sections of the California Civil Code, California Code of Civil

13  Procedure, California Family Code, and California Penal Code.[1]  2022 Cal. Legis. Serv. Ch. 810

14  (West).  As previewed above, these additions and amendments pertain to California state law with

15  respect to the provision of gender-affirming health care and gender-affirming mental health care

16  to minors.  *See id.*  In defining "gender-affirming health care" and "gender-affirming mental

17  health care," SB 107 relies on the definitions stated in the California Welfare & Institutions Code:

> (A) "Gender affirming health care" means medically necessary health care that respects the gender identity of the patient, as experienced and defined by the patient, and may include, but is not limited to, the following:
>
> > (i) Interventions to suppress the development of endogenous secondary sex characteristics.
> >
> > (ii) Interventions to align the patient's appearance or physical body with the patient's gender identity.
> >
> > (iii) Interventions to alleviate symptoms of clinically significant distress resulting from gender dysphoria, as

---

[1]  Because SB 107 modified several different sections of California's codes, the parties "[f]or ease of reference . . . generally refer[] to the various sections of SB 107 in shorthand" rather than "always not[ing] the specific codes that were amended or added."  (Doc. No. 12 at 9 n.1.)  For this same reason, unless otherwise noted in this order, the court will also refer to SB 107 as a shorthand for all of the modifications and/or additions to the California codes that became effective upon SB 107's enactment.

> defined in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition.
>
> (B) "Gender affirming mental health care" means mental health care or behavioral health care that respects the gender identity of the patient, as experienced and defined by the patient, and may include, but is not limited to, developmentally appropriate exploration and integration of identity, reduction of distress, adaptive coping, and strategies to increase family acceptance.

Cal. Welf. & Inst. Code § 16010.2

The legislative history of SB 107 suggests that it was drafted—at least in part— in response to what SB 107's Bill Analysis referred to as "a series of regressive transphobic laws and executive orders . . . adopted in other states that target transgender youth, their parents, and their medical providers . . . [by] impos[ing] civil and/or criminal liability on transgender youth and the adults who assisted them in obtaining gender-affirming care."  Cal. B. Analysis, S. Comm., SB 107 (Aug. 30, 2022).  That Bill Analysis further states that "many of these laws and orders [from other states] are not limited in geographic scope, meaning the [other] state could attempt to penalize a transgender youth or other person for obtaining gender-affirming care in a state where that care is legal, such as California."  *Id.*  In response to those laws, the author of SB 107, state Senator Scott Weiner explained that SB 107 seeks to:

> [1] mak[e] it clear that other state's laws that punish people for providing or receiving gender-affirming health care is contrary to the public policy of California. . . .
>
> [2] bar healthcare providers from complying with subpoenas requiring the disclosure of medical information related to gender-affirming health care that interferes with a person's right to allow child to receive said care. . . .
>
> [and 3] prohibit law enforcement agencies from making, or intentionally participating in, the arrest of an individual pursuant to an out-of-state arrest warrant based on another state's law against receiving, or allowing a child to receive, gender-affirming health care.

*Id.*

In order to accomplish these stated goals, for example, Section 1 of SB 107 creates California Civil Code § 56.109, which provides that healthcare providers "shall not release medical information related to a person or entity allowing a child to receive gender-affirming

health care or gender-affirming mental health care in response to any civil action . . . based on another state's law that authorizes a person to bring a civil action against a person or entity that allows a child to receive gender-affirming health care or gender-affirming mental health care." Cal. Civil Code § 56.109(a).  Similarly, Section 5 of SB 107 amends California Family Code § 3424 to state that a California court has temporary emergency jurisdiction over child custody determinations "if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to, or threatened with, mistreatment or abuse, *or because the child has been unable to obtain gender-affirming health care or gender-affirming mental health care*."  Cal. Fam. Code § 3424(a) (emphasis added).  Finally, Section 9 of SB 107 adds California Penal Code § 819, which forbids state law enforcement agencies from knowingly making or participating in the arrest or extradition of an individual "pursuant to an out-of-state arrest warrant for violation of another state's law against providing, receiving, or allowing a child to receive gender-affirming health care and gender-affirming mental health care in this state, if that care is lawful under the laws of this state, to the fullest extent permitted by federal law."  Cal. Penal Code § 819(b).[2]

## B.      The Present Action

In its FAC, plaintiff alleges that SB 107 "conflicts with [plaintiff's] mission by allowing children, without parental consent, to change their identity and therefore God's design for their life and by stripping parents of custody."  (Doc. No. 10 at ¶ 12.)  Plaintiff further alleges that since California's enactment of the law, it has diverted its organizational resources "from its other focus areas like critical race theory and abortion rights [in order to] counteract the harms to parental rights resulting from SB 107."  (*Id.* at ¶ 13.)  Specifically, plaintiff represents that in response to SB 107, it has:  implemented educational outreach programs inside and outside of California; funded de-transitioning teenagers to come on the organization's podcast to speak on "the issue"; and "hired individuals to warn parents and churches in California and outside of

---

[2]  While not an exhaustive description of all of SB 107's changes to state law, this brief summary provides sufficient factual background with respect to SB 107 to allow the court to resolve the pending motions.

California about the devastating effects of SB 107 and to explain how parents and churches can protect their children." (*Id.* at ¶¶ 13–14.)  Plaintiff alleges that the enactment of SB 107 has prompted it to focus "nearly exclusively on educating parents and churches about transgender issues and the effect on parental rights" and has caused plaintiff to "divert time and attention from other activities that align with its mission." (*Id.* at ¶ 15.)

Plaintiff initiated this action on March 7, 2023, seeking damages, an order declaring SB 107 unconstitutional on its face, and an injunction preventing further enforcement of SB 107. (Doc. No. 1 at ¶¶ 10, 16.)   On April 13, 2023, plaintiff filed its operative FAC, bringing three claims under 42 U.S.C. § 1983:  (1) violation of the Due Process Clause of the Fourteenth Amendment; (2) violation of the right to familial association under the First and Fourteenth Amendments; and (3) violation of the Full Faith and Credit Clause of the Fourth Amendment. (Doc. No. 10 at 18, 20, 21.)

On April 27, 2023, defendant filed a motion to dismiss plaintiff's FAC pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  (Doc. No. 12.)  Plaintiff filed its opposition to defendant's pending motion on May 11, 2023, and defendant filed his reply thereto on May 22, 2023.  (Doc. Nos. 15, 16.)

On April 27, 2023, plaintiff filed a motion for a preliminary injunction seeking an order enjoining defendant from enforcing SB 107.  (Doc. No. 13 at 7.)  Defendant filed his opposition to plaintiff's pending motion on May 11, 2023, and plaintiff filed its reply thereto on May 22, 2023.  (Doc. Nos. 14, 17.)

## LEGAL STANDARD

### A.   Motion to Dismiss Pursuant to Rule 12(b)(1)[3]

"Federal courts are courts of limited jurisdiction and are presumptively without jurisdiction over civil actions."  *Howard Jarvis Taxpayers Ass'n v. Cal. Secure Choice Ret. Sav. Program*, 443 F. Supp. 3d 1152, 1156 (E.D. Cal. 2020) (citing *Kokkonen v. Guardian Life Ins.*

---

[3]  This order does not address the legal standard governing consideration of motions to dismiss brought under Rule 12(b)(6) because, as explained below, the court does not reach defendant's 12(b)(6) arguments.

*Co.*, 511 U.S. 375, 377 (1994)), *aff'd*, 997 F.3d 848 (9th Cir. 2021).  Federal courts "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."  *Kokkonen*, 511 U.S. at 377 (internal citations omitted).  Subject matter jurisdiction is required; it cannot be forfeited or waived.  *Howard Jarvis Taxpayers Ass'n*, 443 F. Supp. 3d at 1156.  Indeed, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a party may "challenge a federal court's jurisdiction over the subject matter of the complaint."  *Nat'l Photo Grp., LLC v. Allvoices, Inc.*, No. 3:13-cv-03627-JSC, 2014 WL 280391, at *1 (N.D. Cal. Jan. 24, 2014).  "A Rule 12(b)(1) jurisdictional attack may be facial or factual.  In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)).  Here, because defendant argues that the allegations in plaintiff's FAC are insufficient for the invocation of federal jurisdiction over plaintiff's claims, defendant mounts a facial attack under Rule 12(b)(1).

A party making a facial attack does not submit supporting evidence with the motion because jurisdiction is challenged based solely on the pleadings.  *Howard Jarvis Taxpayers Ass'n*, 443 F. Supp. 3d at 1156; *see also Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1084 (N.D. Cal. 2019) ("[C]ourts do not consider evidence outside the pleadings when deciding a facial attack.") (citation omitted).  "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6):  [a]ccepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction."  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  However, the court need not assume the truth of legal conclusions cast in the form of factual allegations.  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

/////

/////

1    **A.      Motion for a Preliminary Injunction**

2            "The proper legal standard for preliminary injunctive relief requires a party to demonstrate

3    'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

4    absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

5    is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting

6    *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v.

7    Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that

8    irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'")

9    (quoting *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).  The Ninth

10   Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that

11   serious questions going to the merits were raised and the balance of hardships tips sharply in the

12   plaintiff's favor."  *All. for Wild Rockies*, 632 F.3d at 1134–35 (quoting *Lands Council v. McNair*,

13   537 F.3d 981, 987 (9th Cir. 2008) (*en banc*), *overruled on other grounds by Winter*, 555 U.S. 7).[4]

14   The party seeking the injunction bears the burden of proof as to each of these elements.  *Klein v.

15   City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *Caribbean Marine Servs. Co. v.

16   Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege

17   imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened

18   injury as a prerequisite to preliminary injunctive relief.").  Finally, an injunction is "an

19   extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

20   to such relief."  *Winter*, 555 U.S. at 22.

21                                            **ANALYSIS**

22           Defendant brings the pending motion to dismiss pursuant to Federal Rules of Civil

23   Procedure 12(b)(1) and 12(b)(6), arguing that plaintiff's entire FAC is subject to dismissal.  (Doc.

24   No. 12 at 8.)  Conversely, in its motion for a preliminary injunction, plaintiff contends that it is

---

25   [4]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale
26   approach survives "when applied as part of the four-element *Winter* test."  *All. for the Wild
     Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of
27   hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,
     so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the
28   injunction is in the public interest."  *Id.* at 1135.

likely to succeed on the merits of its claims, it will continue to suffer irreparable harm absent

injunctive relief, and the balance of equities and public interest favor the granting of a preliminary

injunction.  (Doc. No. 13 at 16, 26–27.)

Because defendant's motion to dismiss raises questions with respect to this court's subject

matter jurisdiction over this action, the court will first address defendant's motion to dismiss

before addressing plaintiff's motion for preliminary injunction.  *See* Fed. R. Civ. P. 12(h)(3) ("If

the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss

the action.").

**A.      Defendant's Motion to Dismiss**

In his motion, defendant Bonta argues that plaintiff's FAC must be dismissed pursuant to

Rule 12(b)(1) because plaintiff lacks Article III standing, plaintiff lacks prudential standing

pursuant to Rule 12(b)(6),[5] and plaintiff fails to state a claim upon which relief may be granted

pursuant to Rule 12(b)(6).  (Doc. No. 12 at 17, 22.)

1.      Article III Standing

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the

threshold requirement imposed by Article III of the Constitution by alleging an actual case or

controversy."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983); *see also Matter of East

Coast Foods, Inc.,* 66 F.4th 1214, 1218 (9th Cir. 2023) (Because "standing is an 'essential and

unchanging' requirement . . . a party must establish an Article III case or controversy before we

exert subject matter jurisdiction.") (citations omitted); *City of Oakland v. Lynch*, 798 F.3d 1159,

1163 (9th Cir. 2015) ("A suit brought by a plaintiff without Article III standing is not a 'case or

controversy,' and Article III federal courts lack subject matter jurisdiction over such suits.")

(quoting *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004)).  An actual case or

---

[5]  "While challenges to a party's Article III standing are appropriate for resolution under Rule 12(b)(1), issues of prudential standing are appropriately resolved under Rule 12(b)(6)."  *Frazier v. City of Fresno*, No. 1:20-cv-01069-DAD-SAB, 2022 WL 1128991, at *5 n.3 (E.D. Cal. Apr. 15, 2022) (citing *Solarmore Mgmt. Servs., Inc. v. Bankr. Est. of DC Solar Sols.*, 2:19-cv-02544-JAM-DB, 2021WL 3077470, at *2 (E.D. Cal. July 21, 2021)); *see also Kurshan v. Safeco Ins. Co. of Am.*, — F. Supp. 3d ——, No. 2:22-cv-00225-DAD-AC, 2023 WL 1070614, at *6 n.3 (E.D. Cal. Jan. 27, 2023).

1  controversy will be held to exist when a plaintiff establishes standing.  *Lujan v. Defs. of Wildlife*,

2  504 U.S. 555, 560 (1992).

3      "[S]tanding requires that (1) the plaintiff suffered an injury in fact, i.e., one that is

4  sufficiently 'concrete and particularized' and 'actual or imminent, not conjectural or

5  hypothetical,' (2) the injury is 'fairly traceable' to the challenged conduct, and (3) the injury is

6  'likely' to be 'redressed by a favorable decision.'"  *Bates v. United Parcel Serv., Inc.*, 511 F.3d

7  974, 985 (9th Cir. 2007) (*en banc*) (citing *Lujan*, 504 U.S. at 560–61).  "Standing must be shown

8  with respect to each form of relief sought, whether it be injunctive relief, damages or civil

9  penalties."  *Id*.  "[T]o establish standing to pursue injunctive relief . . . [plaintiff] must

10  demonstrate a real and immediate threat of repeated injury in the future."  *Chapman v. Pier 1*

11  *Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (internal quotation omitted).

12      "To determine whether organizational standing requirements have been satisfied, [courts]

13  'conduct the same inquiry as in the case of an individual:  Has the plaintiff alleged such a

14  personal stake in the outcome of the controversy as to warrant his invocation of federal-court

15  jurisdiction?'"  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) (quoting

16  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)).  "Organizations can assert

17  standing on behalf of their own members, or in their own right." *E. Bay Sanctuary Covenant*, 993

18  F.3d at 662 (internal citations omitted); *see also Rodriguez v. City of San Jose*, 930 F.3d 1123,

19  1134 (9th Cir. 2019) ("[A]bsent a member with standing, . . . an organizational plaintiff 'may

20  have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever

21  rights and immunities the association itself may enjoy.'") (quoting *Am. Fed'n of Gov't Emps.*

22  *Local 1 v. Stone*, 502 F.3d 1027, 1032 (9th Cir. 2007)).  Here, plaintiff does not assert standing on

23  behalf of its members and instead asserts only that it has standing to bring this action in its own

24  right.  (*See, e.g.*, Doc. No. 15 at 17–18) (explaining that "Our Watch is asserting its own legal

25  rights via organizational standing").

26      An organization has standing on its own behalf if it can show:  (1) that the defendant's

27  actions have frustrated its mission; and (2) that it has spent resources counteracting that

28  frustration.  *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013); *see also E. Bay*

9

*Sanctuary Covenant*, 993 F.3d at 663.  "Of course, organizations cannot 'manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all[.]'"  *E. Bay Sanctuary Covenant*, 993 F.3d at 663 (quoting *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)).  Rather, an organizational plaintiff must "show that it would have suffered some other injury if it had not diverted resources to counteracting the problem."  *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 974 (9th Cir. 2020) (quoting *La Asociacion*, 624 F.3d at 1088).  Thus, "[a]n organization may sue only if it was *forced* to choose between suffering an injury and diverting resources to counteract the injury."  *La Asociacion*, 624 F.3d at 1088 n.4 (emphasis added).

Defendant contends that plaintiff has not met the requirements for organizational standing because it has not identified an actual injury to plaintiff caused by SB 107.  (Doc. No. 12 at 18.)  Specifically, defendant argues that plaintiff "does not offer a single example describing how its pre-existing advocacy, education, and mobilization efforts were hindered by SB 107," and thus, plaintiff "fail[s] to identify any injury that it would have suffered 'if it had not diverted resources to counteracting the problem.'"  (*Id.* at 18–19) (quoting *La Asociacion*, 624 F.3d at 1088).  In opposition to defendant's motion, plaintiff argues that it has standing to bring this action because SB 107 has frustrated its organizational mission of "tackling major cultural issues" by "allowing the state of California to remove children from parental custody when in pursuit of gender-affirming healthcare in violation of the very rights Our Watch advocates to protect."  (Doc. No. 15 at 16–17.)  Plaintiff also argues that it diverted its resources in response to this purported frustration of its mission, specifically by having "educated and assisted parents, spent time discussing potential outcomes of SB 107, and educated parents and churches both inside and outside of California about protecting parental rights in the wake of SB 107."  (*Id.* at 17.)  In reply, defendant asserts that plaintiff's alleged diversion of resources is "an entirely self-inflicted injury" that cannot confer standing upon Our Watch to bring this action because the plaintiff organization has failed to demonstrate that it would have been harmed by SB 107 in any way had it not diverted resources.  (Doc. No. 16 at 4.)

1

*a.      Frustration of Mission*

2      Having considered the parties' respective arguments, the court finds that plaintiff has not

3 adequately pled facts alleging that its mission was sufficiently frustrated by the enactment of SB

4 107 for the purposes of conferring Article III standing.  As noted above, plaintiff characterizes SB

5 107 as "allowing the state of California to remove children from parental custody when in pursuit

6 of gender-affirming healthcare."  (Doc. No. 15 at 17.)  Even assuming, without deciding, that

7 plaintiff's characterization of the enactment in this regard is accurate, "[f]rustration of mission

8 cannot just be a setback to an organization's values or interests, it must result in 'an actual

9 impediment to the organization's real-world efforts on behalf of such principles.'"  *In Def. of*

10 *Animals v. Sanderson Farms, Inc.*, No. 3:20-cv-05293-RS, 2021 WL 4243391, at *3 (N.D. Cal.

11 Sept. 17, 2021) (quoting *Jimenez v. Tsai*, 5:16-cv-04434-EJD, 2017 WL 2423186, at *11 (N.D.

12 Cal. June 5, 2017)); *see also Pierce v. Ducey*, 965 F.3d 1085, 1089 (9th Cir. 2020) ("To be

13 'concrete,' the injury 'must actually exist'—an abstract, theoretical concern will not do.").  In its

14 FAC, plaintiff makes only vague references to the organization's broad mission ("protecting

15 family and parental rights, religious liberty, and the right to life across California") and to its

16 alleged ordinary activities ("legislative advocacy, education of California citizens, and

17 mobilization of California citizens" and "focus areas like critical race theory and abortion

18 rights").  (*See* Doc. No. 10 at ¶¶ 11, 15.)  Yet, critically, the FAC is devoid of any allegations

19 pertaining to what plaintiff's regular activities are and how SB 107's enactment specifically

20 impacts the organization's functions.  Thus, at most, plaintiff has pled facts suggesting that its

21 values have been undermined by SB 107.  (*See, e.g.*, Doc. No. 10 at ¶ 12) ("Our Watch firmly

22 believes that transgenderism is a cultural issue that it must deal with in accordance with God's

23 design for every child, as outlined in the Bible.")  However, in order for plaintiff to have standing

24 to bring this action, "the challenged conduct must harm the organization's activities specifically,

25 not merely frustrate [its] mission in a general sense."  *In Def. of Animals*, 2021 WL 4243391, at

26 *4.  Plaintiff's bare and conclusory allegations are insufficient to show that SB 107 has frustrated

27 /////

28 /////

11

its mission by harming—or even bearing whatsoever upon—any of the organization's activities.[6]

*See In Def. of Animals*, 2021 WL 4243391, at *5 ("[Plaintiff] only pleads facts showing the abstract interests it fights for have been set back by [defendant's conduct]. . . . and asserts its mission has been frustrated.  This is not enough."); *Serv. Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082, 1100 (N.D. Cal. 2018) (holding that an organizational plaintiff did not establish standing where it was unclear whether the challenged policies "constitute[d] more than a setback to [plaintiff's] abstract social interest" because plaintiff's "conclusory" allegations did not provide sufficient "specificity in describing (1) from what and (2) to what its resources have been reallocated"); *see also Conn. Parents Union v. Russel-Tucker*, 8 F.4th 167, 175 (2d Cir. 2021) ("[Plaintiff] speaks loosely of its expenditures to counteract activity—that is, the [challenged memorandum] 'touching on' its 'core mission,' but fails to identify any restrictions on its ability to perform the core activities—such as meetings, lectures, and general organizing—by which it pursued its mission prior to the [challenged memorandum]."); *cf. Animal Legal Def. Fund v. United States Dep't of Agric.*, 223 F. Supp. 3d 1008, 1018 (C.D. Cal. 2016) (noting that

---

[6]  As noted by defendant, "[b]ecause organizational standing requires showing an . . . impediment to an organization's activities [rather than simply its abstract interests], some courts have suggested that it is 'easier for service organizations to show standing,' as opposed to advocacy organizations like [p]laintiff."  (Doc. No. 12 at 20 n.15) (quoting *In Def. of Animals*, 2021 WL 4243391, at *4 n.4); *see also Ctr. for Law and Educ. v. Dep't. of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005) (holding that the organizational plaintiffs failed to demonstrate standing and noting that "[h]ere, the only 'service' impaired is pure-issue advocacy—the very type of activity distinguished by *Havens*) (citing *Havens Realty Corp.*, 455 U.S. at 379); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 922 (D.C. Cir. 2015) (Edwards, J., concurring) ("I would reject [plaintiff's] organizational standing argument because its only expenditures are made for 'pure issue-advocacy,' an insufficient injury to support standing . . . .").  At the hearing on the pending motions, plaintiff disputed defendant's assertion that plaintiff is only an advocacy organization, arguing that it is both an advocacy organization and a service organization because it provides services in the form of giving educational materials to parents and churches.  The court takes no position with respect to whether plaintiff is an advocacy-only organization, which plaintiff appears to allege in its FAC (*see* Doc. No. 10 at ¶ 11) (alleging that plaintiff "accomplishes its mission through legislative advocacy"), or a mixed service-and-advocacy organization, as argued by plaintiff at the hearing.  Rather, the court only notes that the discourse surrounding this issue "does not mean advocacy organizations can never have standing," and the court's conclusion regarding the sufficiency of plaintiff's allegations of its standing to bring this action is unaffected by plaintiff's status as an advocacy-only or a service-and-advocacy organization.  *In Def. of Animals*, 2021 WL 4243391, at *4.

1   organizational plaintiff "has spent over a decade pursuing petitions, campaigns, lawsuits, and

2   outreach efforts to address force-fed foie gras" and thus, defendant's decision to decline

3   plaintiff's petition to initiate rulemaking that would ban force-fed foie gras operated as a

4   "substantial setback to [plaintiff's] goal . . . [and] is fairly characterized as 'frustrating' its

5   mission, even if that is only one of several goals pursued by [plaintiff]") (internal quotation

6   marks, brackets, and citation omitted).

7                    *b.*       *Forced Diversion of Resources*

8                The issue of whether SB 107 frustrated plaintiff's mission is, at least in this case,

9   inextricably intertwined with the issue of whether plaintiff was actually forced to divert resources

10  to counteract an injury caused by defendant's conduct.  The paucity of allegations in the FAC

11  regarding plaintiff's activities or operations in furtherance of its broadly stated mission provides

12  no indication that plaintiff would have suffered an injury had it *not* diverted resources in the wake

13  of SB 107.  As a result, the court has no basis upon which to conclude that its alleged diversion of

14  resources was in any way "forced."  *See La Asociacion,* 624 F.3d at 1088 n.4 ("An organization

15  may sue only if it was forced to choose between suffering an injury and diverting resources to

16  counteract the injury.").  Put simply, because plaintiff has failed to allege that its operations have

17  been "perceptibly impaired" whatsoever by SB 107, plaintiff has likewise failed to allege that it

18  was "forced to respond to prevent injury" by diverting organizational resources to counteract

19  harm caused by SB 107.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding

20  that an organization suffered an injury-in-fact where the defendant's practices "*perceptibly*

21  *impaired* [the organization's] ability to provide counseling and referral services" and explaining

22  that such a "concrete and demonstrable injury to the organization's activities—with the

23  *consequent drain on the organization's resources*—constitutes far more than simply a setback to

24  the organization's abstract social interests") (emphasis added); *see also Food & Water Watch,*

25  *Inc. v. Vilsack*, 808 F.3d 905, 921 (D.C. Cir. 2015) ("[Plaintiff] has alleged nothing more than an

26  abstract injury to its interests that is insufficient to support standing. . . .  Although [plaintiff]

27  alleges that [it] will spend resources educating its members and the public about the [challenged

28  conduct], nothing . . . indicates that [plaintiff's] organizational activities have been perceptibly

impaired in any way."); *In Def. of Animals*, 2021 WL 4243391, at *4 ("The organization must be 'forced' into acting because the defendant affected its operations."); *cf. Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. Vilsack*, 6 F.4th 983, 988 (9th Cir. 2021), *cert. denied*, — U.S. ——, 142 S. Ct. 2867 (2022) (concluding that the organizational plaintiff had standing where plaintiff's mission "includes protecting domestic, independent cattle producers"; plaintiff alleged that it normally devotes around 60% of its resources to educating cattle producers on mandatory assessments on cattle sales; plaintiff's members include cattle producers who object to defendants' use of funds generated by the mandatory assessments on cattle sales; the challenged mandatory assessment program "affects [plaintiff's] mission"; and "if [plaintiff] did not pursue this litigation, [defendants] would have continued to use [mandatory assessment] funds in a way that would frustrate [plaintiff's] organizational mission by allegedly promoting corporate consolidation in the beef industry") (internal quotation marks and brackets omitted).[7]

Moreover, plaintiff's failure to allege that SB 107 caused any "impediment to the organization's real-world efforts on behalf of [its] principles" renders this action distinguishable from those cases in which courts have found that organizational plaintiffs that diverted resources

---

[7]  At the hearing on the pending motion, plaintiff's counsel pointed the court to the Ninth Circuit's recent unpublished memorandum decision in *Election Integrity Project Cal., Inc. v. Weber*, No. 21-56061, 2022 WL 16647768 (9th Cir. Nov. 3, 2022) in support of its argument that plaintiff has pled sufficient facts in its FAC to demonstrate that plaintiff has standing to bring this action.  Because plaintiff did not cite this case in its opposition to defendant's motion to dismiss, defendant has not had an opportunity to address plaintiff's argument with respect to this decision. Nevertheless, the court has reviewed the decision and finds that the minimal analysis therein does not advance plaintiff's argument.  First, there, the Ninth Circuit concluded that the organizational plaintiff adequately alleged both a frustration of mission and a diversion of resources based on plaintiff's allegations that (1) its operations include having volunteers observe and document voting practices in furtherance of its mission to "advocate for greater election integrity," and (2) that a change in state voting procedures ("requiring every active registered voter in California to receive a vote-by-mail ballot" without "develop[ing] procedures to ensure that only eligible voters will receive such ballots in the future") forced plaintiff to expend resources to facilitate these volunteer activities.  *Election Integrity Project Cal.*, 2022 WL 16647768, at *1.  Here, by contrast, plaintiff has not made any showing that SB 107 would have impacted any of plaintiff's core operations such that it was forced to divert resources in response to SB 107's enactment. Second, notably, the Ninth Circuit's decision in the cited case focused on a separate inquiry as to whether the plaintiff had plausibly alleged a credible threat—rather than a speculative fear—of future harm (i.e., election fraud committed through the use of vote-by-mail ballots in future elections).  *Id.*  Thus, plaintiff's reference to this decision is unavailing here.

to combat a defendant's practices had standing to bring suit. *Jimenez*, 2017 WL 2423186, at *11; *see, e.g.*, *E. Bay Sanctuary Covenant*, 993 F.3d at 663 (holding that the organizational plaintiffs who shared a mission of "assisting migrants seeking asylum" had established that a rule promulgated by the Departments of Justice and Homeland Security "perceptibly impaired" plaintiffs' ability to perform the services they were formed to provide because the rule significantly discouraged a large number of asylum-seekers from seeking asylum; the rule hindered plaintiffs' ability to represent certain asylum-seekers; after the rule was announced, one plaintiff became "overwhelmed" with requests for assistance by children who had traveled to the southern border to apply for asylum but could no longer do so, causing a "near complete diversion" of that plaintiff's resources; and the rule "jeopardized" the funding on which plaintiffs "critically depend"); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1039–40 (9th Cir. 2015) (finding that a plaintiff civil rights organizations whose regular activities included conducting voter registration drives had standing based on their allegations that they were forced to expend additional resources registering individuals to vote who, if not for defendant's actions, could have instead been registered to vote by the state public assistance offices); *Valle del Sol*, 732 F.3d at 1012–13, 1018–19 (holding that the organizational plaintiffs had standing to challenge an Arizona law criminalizing "transporting . . . [or] harboring . . . an unauthorized alien" where plaintiffs' "core activities" included transporting and/or sheltering undocumented immigrants, and plaintiffs "therefore reasonably fear[ed]" that their volunteers and/or members would be deterred from participating in organizational activities, causing plaintiffs to divert funding to address their members' and volunteers' concerns about the law's effect); *La Clinica de la Raza v. Trump*, No. 4:19-cv-04980-PJH, 2020 WL 6940934, at *4–5 (N.D. Cal. Nov. 25, 2020) (finding that the organizational plaintiffs, comprised of legal and healthcare organizations, had standing to challenge a rule promulgated by the Department of Homeland Security because plaintiffs had "demonstrate[d] that they would be injured by the Rule if they do nothing . . . [by alleging that] the Rule would increase the organization's no-show rate due to a decrease in patients seeking care" and that the Rule's impact on Medi-Cal enrollment would decrease plaintiffs' revenue).

In contrast to these cases, here, plaintiff Our Watch does not allege, for example, that SB 107 criminalizes any of its activities, that it has been overwhelmed by requests for assistance from out-of-state parents who have lost custody of their children as a result of SB 107's enactment, that plaintiff's funding has in any way been threatened by SB 107, or that any of plaintiff's regular operations would have been affected by SB 107 had plaintiff chosen not to divert resources after the law's enactment.[8]  *See In Def. of Animals*, 2021 WL 4243391, at *5 (finding that an organizational plaintiff lacked standing where, *inter alia*, plaintiff "[did] not allege any members actually sought its guidance, let alone on a scale sufficient to justify diversion of resources").  In other words, plaintiff has simply failed to allege facts indicating that its alleged diversion of resources in response to SB 107 has been anything other than voluntary on its part.  *See Valle del Sol*, 732 F.3d at 1018 ("An organization 'cannot manufacture the injury by . . . simply choosing to spend money fixing a problem that otherwise would not affect the organization at all.'") (quoting *La Asociacion*, 624 F.3d at 1088); *In Def. of Animals*, 2021 WL 4243391, at *4 (explaining that "[i]f the defendant's conduct did not force the plaintiff to divert resources, the only injury comes from the plaintiff's own actions").  Although plaintiff alleges that SB 107 has "prompted Our Watch to focus nearly exclusively on educating parents and churches about transgender issues and the effect on parental rights" (Doc. No. 10 at ¶ 15), courts have recognized that "[e]ven a large new campaign is not enough if the organization is not forced to undertake it."  *In Def. of Animals*, 2021 WL 4243391, at *5; *see also Conn. Parents Union*, 8 F.4th at 175 ("[E]ven construing the record in [plaintiff's] favor, as we must, it is clear that [plaintiff] incurred costs because it decided to initiate a campaign against the [challenged memorandum] to advance its own 'abstract social interests'; thus any costs [plaintiff] incurred

---

[8]  In addition, the court notes that plaintiff "makes no specific averments about what it would have done with its [diverted] time and money" if not for SB 107's enactment.  *In Def. of Animals*, 2021 WL 4243391, at *5 (finding that "conclusory allegations" that if not for defendant's conduct, plaintiff would have used the diverted resources to accomplish other aspects of its organizational mission "cannot support a finding of diversion [of resources]" in the standing context).  Rather, plaintiff states only that "[t]he bill has caused Our Watch to divert time and attention from its other focus areas and activities like legislative advocacy."  (Doc. No. 10 at ¶ 15).

from this campaign were not *involuntary*.") (emphasis in original).  In this case, plaintiff's voluntary decision to allegedly divert its own resources is a "self-inflicted injury [that is not] fairly traceable to the defendant" and thus is insufficient to confer standing upon plaintiff.  *In Def. of Animals*, 2021 WL 4243391, at *4.

Plaintiff does not explicitly address the voluntary nature of its allegedly diverted resources in its opposition to the pending motion to dismiss.[9]  Instead, plaintiff merely argues that "the diversion of resources to counteract the frustration of Our Watch's mission is itself the actual or imminent injury to Our Watch."  (Doc. No. 15 at 14.)  While the Ninth Circuit has held that "[a]n organization suing on its own behalf can establish an injury when it suffered both a diversion of its resources and a frustration of its mission," plaintiff conveniently glosses over the well-established corollary to this principle:  that such an organizational plaintiff "may only sue if it was forced to choose between suffering an injury and diverting resources to counteract the injury."  *La Asociacion*, 624 F.3d at 1088 & 1088 n.4 (internal quotation marks omitted).  It would appear obvious that to hold otherwise "would effectively nullify the constitutional requirements for standing" because it would, in essence, allow an organization to manufacture standing simply by perfunctorily assigning itself a broad organizational mission and "investigating conduct or starting a new campaign against someone who frustrates [that] general mission."  *In Def. of Animals*, 2021 WL 4243391, at *4 (explaining that such an outcome "would be inconsistent with the constitutional minimum for standing, as there is no injury that is "fairly traceable" to the defendant's conduct [because] the plaintiff's own choice causes the injury").

Similarly, plaintiff cites the decisions in *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216 (9th Cir. 2012) and *Smith v. Pacific Properties & Development Corp.*, 358 F.3d 1097 (9th Cir. 2004) in support of the proposition that "courts have routinely found organizational standing on the basis of similar organizational harms,"

---

[9]  At the hearing on the pending motions, plaintiff for the first time advanced the creative but ultimately unpersuasive argument that that in the standing context, an organization's diversion of resources can be entirely voluntary.  Plaintiff's position in this regard is irreconcilable with the law in this circuit, which provides that "[a]n organization 'cannot manufacture the injury by . . . simply choosing to spend money fixing a problem that otherwise would not affect the organization at all.'"  *Valle del Sol*, 732 F.3d at 1018 (quoting *La Asociacion*, 624 F.3d at 1088).

specifically, harms suffered by organizational plaintiffs who diverted resources to create outreach and educational campaigns in response to the challenged conduct.  (Doc. No. 15 at 16.)  Plaintiff is correct that these decisions confirm that it is possible for organizational plaintiffs who divert resources toward outreach and educational campaigns to have standing to challenge a defendant's conduct.  *See Fair Hous. Council of San Fernando Valley*, 666 F.3d at 1219 (finding that the nonprofit organization's investigation of defendant's allegedly discriminatory practices and subsequent diversion of resources toward new education and outreach campaigns targeted at discriminatory roommate advertising constituted an injury caused by frustration of plaintiff's central mission for purposes of standing); *Smith*, 358 F. 3d at 1105–06 (holding that the organizational plaintiff had standing where the plaintiff was a nonprofit corporation organized with the principal purpose of helping eliminate discrimination against individuals with disabilities, including by ensuring an adequate supply of accessible housing for individuals freed to leave nursing homes; plaintiff alleged that defendant designed inaccessible properties in violation of federal law; and plaintiff alleged that it diverted resources from its regular activities in order to promote awareness of and compliance with federal and state accessibility laws and to "benefit the disabled community in other ways").  Yet, in advancing this contention, plaintiff once again ignores binding Ninth Circuit precedent providing that in order for such a plaintiff to have standing, that organizational plaintiff must also "show that it would have suffered some other injury if it had not diverted resources to counteracting the problem.'" [10]  *La Asociacion*, 624 F.3d at 1088; *see also E. Bay Sanctuary Covenant*, 993 F.3d at 663; *Valle del Sol*, 832 F.3d at 1018; *People for the Ethical Treatment of Animals, Inc. v. United States Fish & Wildlife Serv.*, No. 2:12-cv-04435-DMG-MAN, 2014 WL 12580234, at *5 (C.D. Cal. Jan. 31, 2014) (explaining

---

[10]  The court acknowledges that the Ninth Circuit has not engaged in an explicit analysis of this required showing in every case in which it has held that an organization had standing on the basis of frustration of mission and diversion of resources.  *See, e.g.*, *Fair Hous. Council of San Fernando Valley*, 666 F.3d at 1219.  However, the absence of such an articulated analysis indicates that the plaintiffs in those cases easily met this requirement; it does not suggest that the Ninth Circuit has abandoned these long-held standing requirements.  Indeed, recent decisions by the Ninth Circuit have reiterated the requirement that an organizational plaintiff must show that it would have suffered an injury had it not diverted resources to counteract the challenged conduct.  *See, e.g.*, *E. Bay Sanctuary Covenant*, 994 F.3d at 974 (quoting *La Asociacion*, 624 F.3d at 1088).

that "'[s]ome other injury' to the organization usually consists of harm to an organization's existing programs or members") (quoting *La Asociacion*, 624 F.3d at 1088).  As explained in great detail above, plaintiff simply has not done so here.

In its opposition to defendant's pending motion to dismiss, plaintiff also appears to advance the unpersuasive argument that its diversion of resources cannot be construed as merely an attempt to manufacture standing in this action because it began diverting resources as soon as SB 170 became law, rather than after initiating this litigation.  (Doc. No. 15 at 15–16) ("Our Watch began diverting resources as soon as SB 107 became law due to the grave dangers presented by the bill—not for purposes of manufacturing standing. . . . Our Watch immediately began new educational outreach programs both inside and outside of California and even funded de-transitioning teenagers to come on the organization's podcast to speak on the issue.")  While it is true that "[a]n organization cannot . . . manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit," an organization likewise may not "manufacture the injury by . . . simply choosing to spend money fixing a problem that otherwise would not affect the organization at all."  *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 903 (9th Cir. 2002) (quoting *Spann v. Colonial Vill. Inc.*, 899 F.2d 24, 27–29 (D.C. Cir. 1990)); *La Asociacion*, 624 F.3d at 1088.  In other words, the fact that an organizational plaintiff expended its resources on campaigns not associated with litigation, without more, is not a golden ticket to obtaining Article III standing.  Plaintiff's argument in this regard therefore has no bearing upon the court's conclusion that plaintiff has not pled sufficient facts to demonstrate that it has standing to bring this action.

Accordingly, the court finds that plaintiff lacks Article III standing to assert its claims in this action and will grant defendant's motion to dismiss on that basis.

2.     Leave to Amend

Plaintiff has requested leave to file a second amended complaint in the event that the court grants defendant's motion to dismiss.  (Doc. No. 15 at 30.)  "Courts are free to grant a party leave to amend whenever 'justice so requires,' and requests for leave should be granted with 'extreme liberality.'"  *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009) (citations omitted).

1    There are several factors a district court considers in determining whether to grant leave to

2    amend, including undue delay, the movant's bad faith or dilatory motive, repeated failure to cure

3    deficiencies by amendments previously allowed, undue prejudice to the opposing party, and

4    futility.  *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (citing *Foman v.*

5    *Davis*, 371 U.S. 178, 182 (1962)).

6        The court notes that plaintiff has already amended its complaint in this action once, and

7    the court is doubtful that plaintiff will be able to remedy the deficiencies described in this order.

8    The court's doubts in this regard are based in part upon plaintiff's apparent position at the hearing

9    on the pending motions that, in order to have standing, plaintiff need not allege anything more

10   than a vague mission and a voluntary diversion of resources.  Nonetheless, out of an abundance of

11   caution, and because defendant does not assert that it will be unduly prejudiced by allowing

12   plaintiff to file a second amended complaint, the court will grant plaintiff leave to amend.  *See*

13   *Nat'l Council of La Raza*, 800 F.3d at 1041 ("It is black-letter law that a district court must give

14   plaintiffs at least one chance to amend a deficient complaint, absent a clear showing that

15   amendment would be futile.").

16       Therefore, defendant's motion to dismiss plaintiff's FAC pursuant to Rule 12(b)(1) will be

17   granted with leave to amend.

18           3.        Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6)

19       Because the court concludes that plaintiff lacks Article III standing to bring this action

20   pursuant to Rule 12(b)(1), the court need not reach defendant's arguments in support of his

21   motion to dismiss pursuant to Rule 12(b)(6).  Accordingly, defendant's motion to dismiss

22   pursuant to Rule 12(b)(6) will be denied as having been rendered moot by this order.  In the event

23   plaintiff files a second amended complaint, defendant may re-assert his Rule 12(b)(6) arguments

24   in response to that complaint.

25   **B.      Plaintiff's Motion for a Preliminary Injunction**

26       In order to prevail on its motion for a preliminary injunction, plaintiff bears the burden of

27   demonstrating that it is likely to succeed on the merits of its claims, that it is likely to suffer

28   irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor,

1    and that an injunction is in the public interest.  *Stormans*, 586 F.3d at 1127.  With respect to the

2    first requirement, plaintiff must show that at the very least, that "serious questions going to the

3    merits were raised."  *All. for the Wild Rockies*, 632 F.3d at 1131.

4         Here, because plaintiff has failed to allege facts sufficient to show that it has standing to

5    bring this action, plaintiff has likewise failed to meet its burden of showing that it is likely to

6    succeed on the merits of its claims. [11]  *See Deck v. Wells Fargo Bank, N.A.*, No. 2:17-cv-00234-

7    MCE-KJN, 2017 WL 815678, at *3 (E.D. Cal. Feb, 27, 2017) ("Due to his lack of standing,

8    Plaintiff cannot show that he is reasonably likely to succeed on the merits, nor can even raise

9    serious questions as to the merits, of any of his claims.").

10        Therefore, the court will deny plaintiff's motion for a preliminary injunction at this time.

11                                      **CONCLUSION**

12        For the reasons stated above:

13   1.    Defendant's motion to dismiss plaintiff's first amended complaint due to

14         plaintiff's lack of Article III standing (Doc. No. 12) is granted, with leave to

15         amend;

16   2.    The remainder of defendants' motion to dismiss (Doc. No. 12) is denied as having

17         been rendered moot by this order;

18   3.    Plaintiff's motion for a preliminary injunction (Doc. No. 13) is denied;

19   4.    Plaintiff shall file its second amended complaint, or alternatively, a notice of its

20         intent to not file a second amended complaint, within fourteen (14) days from the

21         date of entry of this order; and

22   /////

23   /////

24   /////

25   /////

26   _____

27   [11]  The court notes that the parties raise identical arguments with respect to plaintiff's standing in their briefing on plaintiff's pending motion for a preliminary injunction as they did in their briefing on defendant's motion to dismiss.  (*See* Doc. Nos. 12 at 17–20; 14 at 16–19; 15 at 14–17;

28   16 at 3–5; 17 at 7–10.)

5.      Plaintiff is warned that its failure to comply with this order may result in dismissal
of this action due to plaintiff's failure to prosecute.

IT IS SO ORDERED.

Dated:   **July 17, 2023**                    _____
                                              UNITED STATES DISTRICT JUDGE

22